## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| A.D. an individual, | |
| Plaintiff, | |
| vs. | Case No.: 2:22-cv-00647-JES-NPM |
| CHOICE HOTELS INTERNATIONAL, INC.; R&M REAL ESTATE COMPANY, INC.; ROBERT VOCISANO; and MARIO VOCISANO, | SECOND AMENDED COMPLAINT  DEMAND FOR JURY TRIAL |
| Defendant(s). | |

## <u>SECOND AMENDED COMPLAINT</u>

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## <u>SUMMARY</u>

1. For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the

1

expense of human life, human rights, and human dignity.

2. Defendant Choice Hotels International, Inc. ("Choice") knows and has known for years that sex trafficking and prostitution repeatedly occurred and continues to occur under their brand flag and at their branded hotel locations.

3. Defendants R&M Real Estate Company, Inc., Robert Vocisano, and Mario Vocisano (the "R&M Defendants") know and have known for years that sex trafficking and prostitution repeatedly occurred and continues to occur at its Quality Inn & Suites® Golf Resort ("Quality Inn") located at 4100 Golden Gate Parkway, Naples, Florida 34116 where A.D. was trafficked.

4. Defendant Choice and the R&M Defendants have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[1]

5. Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the R&M Defendants as

---

[1] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

owners of a Choice-branded hotel and Defendant Choice, who is a major player in the hospitality industry. The presence of sex trafficking and sexual exploitation in hotels is a frequent and obvious occurrence and numerous well-researched training and toolkits have been published over the last decade to help hotel staff in every position to identify the signs.[2]

6.      Obvious signs of sex trafficking at a hotel, including Defendants' brand hotels, may include: an excess of condoms in rooms; individuals carrying or flashing large amounts of cash; excessive amounts of cash stored in the room; renting two (2) rooms next door to each other; declining room service for several consecutive days; significant foot traffic in and out of room(s); men traveling with multiple women who appear unrelated; women known to be staying in rooms without leaving; women displaying physical injuries or signs of fear and anxiety; guests checking in with little or no luggage; hotel guests who prevent another individual from speaking for themselves; or a guest controlling another's identification documents.[3]

7.      Hotel staff who have undergone training are more aware of sex

---

[2] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*. Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[3] *Id. See also*, Shea M. Rhodes, Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), *available at* https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf

trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[4]

8. Hotel brand companies such as Choice were obligated to adopt policies and procedures related to sex trafficking and enforce these policies and procedures as brand standards and hotel operation standards.

9. Hotel owners such as the R&M Defendants were obligated to implement policies and procedures related to the prevention of sex trafficking pursuant to brand standards as well as local and state laws.

10. Rather than taking timely and effective measures known to prevent or combat sex trafficking and forced prostitution occurrences on their hotel properties, Defendants hewed to a common policy of harboring known and suspected human traffickers in exchange for financial and other benefits and actively ignored signs of ongoing human trafficking in their hotels.

11. With proper training and the implementation of reasonable security measures, Defendants could have prevented regular sex trafficking in the hotels they own, operate, supervise, franchise, and/or brand under their flag, including the Quality Inn hotel where Plaintiff was trafficked.

12. This action for damages is brought by the Plaintiff, a survivor of sex

---

[4] CNN Wire Staff, U.S. human trafficking report includes U.S. cases for first time, CNN.com (Jun. 14, 2010), *available at* https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA").

13. A.D. was repeatedly sexually exploited, demeaned and left with multiple unaddressed injuries, while Defendants turned a blind eye to clear and accessible red flags and indicators of her trafficking and continued to benefit financially and otherwise.

14. Between approximately February 2012 and March 2012, Plaintiff was repeatedly sold and exploited for commercial sex at hotels throughout Central Florida, including the Quality Inn hotel.

15. Between approximately February 2012 and April 2012, Plaintiff was repeatedly sold and exploited for commercial sex at the Quality Inn hotel.

16. At the Quality Inn hotel, A.D. was trafficked for commercial sex by Trafficker 2 through force, fraud, and coercion, while Defendants turned a blind eye and continued to benefit.

17. At the Quality Inn hotel, A.D.'s traffickers advertised A.D. for sex on various websites known for trafficking and sexual exploitation, whereby Defendants, through their agreements, terms, or policies related to internet and software, provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of A.D. for the

purpose of sex trafficking.

18. With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures and refusals to act, mandate, establish, execute, and/or modify their anti-trafficking efforts at the Quality Inn hotel, A.D. was continuously sex trafficked, sexually exploited, and victimized repeatedly at the Quality Inn hotel.

19. The Plaintiff brings this action pursuant to the TVPRA, 18 U.S.C. § 1595, against the Defendants who participated in a hotel operating venture and knowingly benefited from this venture through room rentals, profits, third party fees, and the value of the "good will" of the Choice® brand. The venture knew or should have known that they were profiting from sex trafficking, including the sex trafficking of A.D., in violation of the TVPRA. Defendants turned a blind-eye to knowledge regarding anti-trafficking efforts, including local advances made by local organizations, and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## **PARTIES**

20. **Plaintiff A.D.** is a natural person who resides in Collier County, Florida.

   a. The Plaintiff is a victim of trafficking pursuant to 18 U.S.C. § 1591 and a victim of a "severe form of trafficking" as it is defined under

6

22 U.S.C. § 7102 (16).

b. Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[5]

21. **Defendant Choice Hotels International, Inc. ("Choice")** is one of the largest hotel franchising companies in the world with over 7,000 branded properties in more than forty (40) countries and territories. It is a Delaware corporation and can be served by its registered agent, Corporation Service Company, at 251 Little Falls Drive, Wilmington, Delaware 19808.

a. Choice is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Quality Inn hotel; has caused indivisible injuries to A.D. in Florida; and profited from illegal commercial sex trafficking involving Plaintiff at its hotel.

b. Choice maintains a registered agent in the State of Florida and can

---

[5] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

be served with service of process at the United States Corporation Company located at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

22. **Defendants R&M Real Estate Company, Inc., Robert Vocisano, and Mario Vocisano (the "R&M Defendants")**, doing business as the Quality Inn & Suites® Golf Resort ("Quality Inn"), own, operate, manage, and direct one of Defendant Choice's branded properties. The R&M Defendants may be served with service of process at their corporate mailing address, 4100 Golden Gate Parkway, Naples, Florida 34116.

23. Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

<u>**JURISDICTION AND VENUE**</u>

24. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to

claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

26. Defendants have submitted to the jurisdiction of Florida and have purposefully availed themselves of the privilege of conducting acts in Florida through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Florida; Florida has an equally strong interest in protecting and assuring the safety of persons within its State.

**SEX TRAFFICKING UNDER FEDERAL LAW**

27. The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation

of this chapter." 18 U.S.C. § 1595(a).[6]

28.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

## FACTUAL ALLEGATIONS

### A.     PARTICIPATION IN A VENTURE:
### Defendant Choice and the R&M Defendants
### Participate in a Hotel Operating Venture

29.     Defendant Choice participated in a hotel operating venture that included the R&M Defendants. The venture also included hotel staff and employees at the Quality Inn hotel, including but not limited to, the maintenance workers, housekeeping and janitorial staff, front desk staff, booking or reservation staff, kitchen and room service staff, hotel managers and assistant managers, bookkeepers and accountants, bellhops, and valets. Together, the aforementioned venture participants operate, supervise, and/or manage the Quality Inn hotel where A.D. was trafficked.

30.     The R&M Defendants own the Quality Inn® & Suites Golf Resort – Naples ("Quality Inn") located at 4100 Golden Gate Parkway, Naples, Florida 34116 and operated the hotel pursuant to the franchise agreement it entered into

---

[6] On January 5, 2023, Congress once again expanded the scope of liability for civil beneficiary claims pursuant to Section 1595 of the TVPRA.

with Defendant Choice in approximately 1987.

31.     In approximately 1987, the R&M Defendants entered into a franchise agreement with Defendant Choice in connection with the management and operation of the Quality Inn hotel.

32.     Choice was in an agency relationship with the R&M Defendants offering public lodging services in the hotel. This agency relationship was established through Defendant Choice's exercise of an ongoing and systemic right of control over the Quality Inn hotel by Defendant Choice's operations, including the means and methods of how Quality Inn hotel conducted daily business through one or more of the following actions:

    a. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    b. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    c. providing new hire orientation on human rights and corporate responsibility;

    d. providing training and education to Quality Inn® branded hotels through webinars, seminars, conferences, and online portals;

e. providing and controlling customer review and response platforms;

f. hosting online bookings on Defendant Choice's domain;

g. requiring Quality Inn® branded hotels to use Defendant Choice's customer rewards program;

h. requiring Quality Inn® branded hotels to use Defendant Choice's property management software;

i. requiring Quality Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

j. providing IT support for all property management systems, owned, operated and required by Choice;

k. setting employee wages;

l. making employment decisions;

m. advertising for employment;

n. sharing profits;

o. requiring Quality Inn® branded hotels to use Defendant Choice's property management software;

p. requiring Quality Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

q. providing IT support for all property management systems, owned, operated and required by Choice;

r. standardized training methods for employees;

s. building and maintaining the facility in a manner specified by the owner;

t. standardized or strict rules of operation;

u. regular inspection of the facility and operation by owner;

v. fixing prices; or

w. other actions that deprive Quality Inn® branded hotels of independence in business operations.

33. An apparent agency also exists between Defendant Choice and Quality Inn hotel. Defendant Choice held out Quality Inn® branded hotels to the public as possessing authority to act on its behalf. Defendant Choice clothed the Quality Inn hotel with apparent authority to act for Defendant Choice in the following ways: by requiring the use of Choice signs, providing Choice branded stationery, requiring the use of Choice's website and Choice's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Choice guest rewards programs. On information and belief, Defendant Choice's conduct reasonably led A.D.'s perpetrator to believe that the Quality Inn hotel had the authority it purported to have, and A.D. was injured as a result.

34. As the principal and as a hotel operator, Choice controls the training, policies, and decisions on implementation and execution of policy for its branded properties, including the Quality Inn hotel where A.D. was trafficked.

35. Quality Inn hotel's website is hosted at Choice's domain, www.choicehotels.com.

36. When staying at Choice branded hotels, guests receive Choice Privileges® (Choice rewards) for bookings.

37. Defendant Choice exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Quality Inn hotel where A.D. was trafficked for sex.

38. Defendant Choice exercises day-to-day control over the Quality Inn hotel, as well its lax policies and procedures with respect to the prevention of sex trafficking on its hotel properties, including the Quality Inn hotel, through its brand standards and retains control over the Quality Inn hotel through its corporate structure, including its franchise agreements, brand standards, licensing agreements, and operating agreements.

39. Choice makes decisions that directly impact the operations and maintenance of their branded hotels, including the Quality Inn hotel.

40. Choice is the principal in an agency relationship with the Quality Inn hotel. In addition to Choice's liability under TVPRA section 1595, Choice is

vicariously liable for the acts and/or omissions of the staff at its Quality Inn hotel.

41. The Quality Inn hotel where A.D. was trafficked has apparent agency for Choice so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

42. Defendant Choice has ratified the actions and inactions of the R&M Defendants.

43. Defendant Choice and the R&M Defendants are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Quality Inn hotel where the Plaintiff was trafficked for sex. Defendant Choice and the R&M Defendants each share the common policies and practices complained of herein.

44. Defendant Choice and the R&M Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

45. As an integrated enterprise and/or joint employer, Defendant Choice and the R&M Defendants are separately and jointly responsible for compliance with all applicable laws.

46. As an integrated enterprise and/or joint employer, Defendant Choice and the R&M Defendants are jointly and severally liable for any damages caused by their employees.

47. Defendant Choice and the R&M Defendants are considered employers under federal labor regulations.

48. Upon information and belief, Choice controls a uniform and required reservation and marketing system, credit processing system, and training and policy on brand standards, including policies on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Quality Inn hotel where A.D. was trafficked.

49. At all relevant times, the R&M Defendants was involved in the staffing and operation of the Quality Inn hotel where A.D. was trafficked for sex. The R&M Defendants managed the hotel pursuant to a franchise agreement with Defendant Choice. Directly and through its franchise agreement with Defendant Choice, the R&M Defendants directly offered public lodging services at the Quality Inn hotel where A.D. was trafficked for sex.

50. As hotel owners, the R&M Defendants participated in a hotel

operating venture that included hotel staff and employees who were closely involved with the daily management and operations of the hotel pursuant to Defendant Choice's brand standards, franchise agreements, licensing agreements, and operating agreements.

51. At all relevant times, the R&M Defendants owned, managed, supervised, and/or operated the Quality Inn hotel through its brand standards and franchise agreement. Because Choice operated the Quality Inn hotel where A.D. was trafficked and was responsible for its management, supervision, and day-to-day operations, the Defendants, jointly knowingly benefited or received something of value from its participation in a venture which it knew or should have known facilitated sex trafficking through the room rentals A.D. was victimized in.

52. Defendant Choice and the R&M Defendants participated in a hotel operating venture in connection with the management and operating of the Quality Inn hotel involving risk and potential profit.

**B. KNEW OR SHOULD HAVE KNOWN:**
**Defendant Choice and the R&M Defendants Knew or Should Have Known**
**Their Hotel Business Venture Violated the TVPRA**

53. At all times that Plaintiff was trafficked at the Quality Inn hotel, Defendants refused or failed to require any Human Trafficking training despite knowing that trafficking was occurring.

54. Defendant Choice and the R&M Defendants knew or should have known that forced prostitution and trafficking was taking place well before Plaintiff was trafficked.

55. Upon information and belief, between at least 2008 to 2012, Defendant Choice held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

56. Upon information and belief, between at least 2008 to 2012 Choice held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

57. Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Choice that related to sex trafficking in hotels, including the R&M Defendants' Quality Inn hotel.

58. Choice represents that it considers guest safety and security important and requires the brand hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.

59. Defendant Choice maintains data in server logs and internet files that could be used to help prevent human trafficking, but it fails to use this data for the prevention of human trafficking.

60. Even though Defendant Choice has sought and received publicity for its purported anti-human trafficking measures, Defendant Choice could have

18

accessed data and databases, including from data from The Polaris Project, that demonstrated the prevalence of human trafficking at Choice-branded hotels and in the hospitality industry generally. Despite the availability of such data and information, Defendant Choice ignored or turned a blind eye to the growing body of information regarding the prevalence of human trafficking at Choice brand hotels and in the hospitality industry generally and continued to profit from the human trafficking occurring at Choice brand hotels.

61. In the instance of Plaintiff A.D., had staff at the Quality Inn been properly trained, many of the human trafficking red flags and indicators would have been recognized and reported. But Defendant Choice chose not to invest the time to implement and execute the anti-trafficking program amongst its branded hotels. Instead, the only steps Choice took were to advertise to the public that they had implemented human trafficking policies. Defendant Choice breached its duties and did not implement or enforce anti-human trafficking policies that could have saved the Plaintiff from being sex trafficked at its branded hotels.

62. Despite knowledge of the problem of sex trafficking in its hotels, Defendant Choice did not require that employees participate in training to prevent sex trafficking and only "recommended" this training to new employees during

the time the Plaintiff was victimized.[7]

63.    Defendant Choice had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on its branded property via the following:

a. Defendant Choice supervises, manages, or operates the Quality Inn hotel located at 4100 Golden Gate Parkway, Naples, Florida 34116 through its brand standards, franchise agreements, operating agreements, and/or licensing agreements. Choice failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendant Choice voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Choice failed to implement its own policies and those recommended to it by the above-mentioned advocacy organization which led to the inevitable consequence of continued trafficking at

---

[7] *Belinda Luscombe*, Time.com, *How To Spot A Human Trafficking Victim At A Hotel* (Oct. 28, 2014), http://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

its branded properties, including the trafficking of A.D.[8]

c. Upon information and belief, Plaintiff alleges that Choice implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d. Defendant Choice had actual knowledge of sex trafficking occurring on its branded hotel properties because Choice and the R&M Defendants knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice and the R&M Defendants allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Quality Inn hotel. Choice and the R&M Defendants facilitated the trafficking through its practices, policies, and procedures. Choice and the R&M Defendants failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice and the R&M Defendants could continue to profit from the business that

---

[8] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

trafficking brings, including business from out-of-state.

e. Defendant Choice had constructive knowledge of sex trafficking occurring on its branded hotel properties because Choice and the R&M Defendants knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Choice and the R&M Defendants allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Quality Inn hotel. Choice and the R&M Defendants facilitated the trafficking through its practices, policies, and procedures. Choice and the R&M Defendants failed to take appropriate action to prevent the trafficking of individuals for sex so that Choice and the R&M Defendants could continue to profit from the business that trafficking brings, including business from out-of-state.

f. Choice knew or should have known that the Quality Inn hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was

22

trafficked.

g. Choice brand hotel properties know and have known for more than a decade that criminal sex trafficking of adults and children repeatedly occurs on their properties throughout the country. Rather than take timely and effective measures to prevent human trafficking, Choice brand hotels, and their respective parent companies, have instead failed to address the open and obvious presence of human trafficking on hotel properties and continue to profit from traffickers renting rooms for the explicit and readily apparent purpose of human trafficking.

h. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Choice has repeatedly ignored these actions.

i. Upon information and belief, Defendant Choice could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Choice's management and control and included all of the indicia of A.D.'s trafficking. This

data included the details of A.D.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

64. Given Defendant Choice's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Quality Inn hotel, Defendant Choice breached its duties in the following ways:

a. did not adequately distribute information to assist employees in identifying human trafficking;

b. failed to mandate a process for escalating human trafficking concerns within the organization;

c. failed to mandate managers, employees, or owners attend training related to human trafficking;

d. failed to provide new hire orientation on human rights and

corporate responsibility;

e. failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

f. failed to develop and hold or require ongoing training sessions on human trafficking; or

g. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

h. failed to evaluate universal reservation systems for suspicious booking activities;

i. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

j. failed to ban cash or prepaid credit cards as payment; and

k. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

65. Upon information and belief, Defendant Choice requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that

Defendant Choice specifies and requires.[9]

66.     Upon information and belief, Defendant Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Choice access to the internet data.

67.     Defendant Choice states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[10]

68.     Defendant Choice retains and can view internet access, which may

---

[9] *See* https://web.archive.org/web/20200427221712/https://thepointsguy.com/2014/11/free-hotel-wifi-how-to-get-online-while-youre-on-property/ (Choice Hotels has stringent requirements for its preferred vendors).

[10] *See* Choice Hotels Privacy Policy, *available at* https://www.choicehotels.com/legal/privacy-policy

include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

69. Choice's centralized property management system also gains Choice access to Choice hotel guest information and registration information, including names, date of booking, and length of stay.

70. Upon information and belief, Defendant Choice can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

71. Upon information and belief, Defendant Choice has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[11]

72. Upon information and belief, Defendant Choice can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on

---

[11] *See* Slideshow from Liveport in 2011, showing dashboard of Access Logs, with quote "we monitor your network" *available at* https://web.archive.org/web/20200428003032/https:/www.slideshare.net/Liveport/2011-liveport-choice-hotels-international-convention-slideshow; see also, e.g., supra n. 62.

Backpage.com.

73. Upon information and belief, and contrary to ECPAT best practices, Defendant Choice failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

74. Upon information and belief, Defendant Choice's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Quality Inn hotel where Plaintiff was trafficked for sex.

75. Despite access to information comprising clear sex trafficking indicators, Defendant Choice continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

76. Upon information and belief, Defendant Choice monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

77. Upon information and belief, Defendant Choice provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Choice controls and houses this collective data from all branded properties.

78. For years, Defendant Choice has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically

occurs on its Quality Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at the Quality Inn hotel that forms the basis of this complaint. For example:

    a. On November 10, 2009, a young child was raped and killed at a Comfort Inn, which is a Choice-branded hotel, in Fayetteville, North Carolina.[12] The incident caused such outrage that child advocates petitioned Defendant Choice to take steps to prevent sex trafficking in its hotels.[13] It was only after this horrific incident that Defendant Choice started to publicize a need for change.

    b. In November 2010, Defendant Choice partnered with ECPAT-USA to develop a training module to educate its management and staff in the prevention of sex trafficking.[14] However, Defendant Choice did not enforce the program, or require its employees to complete

---

[12] WRAL.com, *Shaniya Davis Was Raped, Killed On Same Day* (Nov. 20, 2009), http://www.wral.com/news/local/story/6464217/ (Warrants: Girl abducted, raped, killed on same day.)

[13] *See* Change.org Petition, *Tell Choice Hotels To Prevent Child Prostitution In Their Hotels*, available at https://www.change.org/search?q=tell+choice+hotels+to+prevent+child+prostitution+in+their+hotels (last visited Mar. 4, 2019).

[14] *See* Choice Hotels, *Human Rights Policy*, available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 4, 2019); *see also* ECPAT-USA, *Tourism Protection Code of Conduct*, available at http://www.ecpatusa.org/code/ (last visited Mar. 4, 2019).

this training, or even follow up to make sure the hotels were following the protocols.[15]

    c. In 2012, an anti-trafficking coalition alerted Defendant Choice of the likelihood of sex trafficking during the London Olympics, and inquired about the company's anti-trafficking policies, while urging immediate action regarding trafficking.[16]

79. Additionally, Defendant Choice has been aware of sex trafficking and guest safety issues on Quality Inn® branded properties through publicly available websites such as www.tripadvisor.com, www.expedia.com, and www.booking.com. Online reviews and public newspaper articles show the pervasiveness of customer reported sex trafficking and guest safety issues on Quality Inn® branded properties and Defendant Choice's inattentiveness, for example:

    a. In April of 2011, a female escort was choked and robbed by three men in a Quality Inn hotel room in Plantation, Florida.[17]

    b. In February of 2012, a fourteen-year-old girl was found at a Quality Inn in Oakland, Pennsylvania after missing for a year when

---

[15] *See* Choice Hotels, *Human Rights Policy, supra* n.30.

[16] *See* Christian Brothers Investment Services, London Olympics Report Release, *available at* https://cbisonline.com/us/london-olympics-report-release/

[17] *Escorts Target of Spree*, The Miami Herald, Jun. 06, 2011, at pg 20

authorities set up a sting operation into internet advertisement.[18]

c. In March of 2012, two men were arrested for sex trafficking two minors at a Quality Inn hotel in Houston, Texas.[19]

d. In November 2012, two women and one man were arrested at a Quality Inn in Boca Raton, Florida after authorities were seeking to crack down on human trafficking.[20]

e. In November of 2012, a reviewer described the Quality Inn in Jacksonville, Florida as follows: "As we pull up we have a perfect first impression of one of the local "working" girls heading out to make a buck off a tractor trailer driver. The room had dirty towels on the floor in the corner but the staff was great."[21]

f. In March of 2015, a reviewer described the Defendants' Quality Inn hotel as follows: "…Very strange. A traveling friend of ours on the 1st floor heard a knock from the patio sliding door Friday night. When he pulled back the drapes, three guys (possibly drunk from the bar) told them they were there to rob him and wanted his

---

[18] *Missing Teen Found During Prostitution Bust*, Pittsburgh Post-Gazette, Feb. 12,2012, at pg 12

[19] *Two Men Accused of Child Sex Violations Await Trials*, The Odessa American, Apr. 14, 2012, at pg A1 and A4

[20] *Police Arrest 16 in Prostitution Sting*, The Palm Beach Post, Nov. 23, 2012, at pg B010

[21] Review of Quality Inn Orange Park Jacksonville, *available at* https://www.orbitz.com/Jacksonville-Hotels-Quality-Inn-Orange-Park-Jacksonville.h10686.Hotel-Information

money. An awful experience all around. I was super glad to leave. Avoid at all costs."[22]

g. In September of 2016, police responded to a Quality Inn in Oak Grove, Kentucky where a young girl was being held against her will and forced to solicit sexual acts. The hotel staff had knowledge of the sex trafficking.[23]

h. In August of 2017, a reviewer described a Comfort Inn in Naples, Florida as follows: "…Oh AND. Two days in a row, there was a shady homeless girl who kept hanging around the lobby and would ask us for money every time we walked in and out the front entrance. So that was…interesting. Not sure why the hotel let her loiter in the parking lot and in the lobby area for two days straight, but it made us uncomfortable. Because every time we walked in or out, we knew she was going to give us her story about how her boyfriend just left her in this town and she has no money blah blah

---

[22] Review of Quality Inn® & Suites Golf Resort; *available at* https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or55-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida.html#REVIEWS

[23] *Oak Grove Police sergeant, 2 others arrested during prostitution investigation*, CLARKSVILLENOW.COM (Sept. 28, 2016), *available at* https://clarksvillenow.com/local/oak-grove-police-sergeant-2-others-arrested-during-prostitution-investigation/

blah…"[24]

    i. In January of 2018, a reviewer described the Defendants' Quality Inn as follows: "We stayed for two nights while visiting Naples. Location is not bad and there is plenty of parking but it is the least likely site for a golf resort. The area around the hotel seemed a bit odd with people who did not appear to belong to the hotel wandering around. It seemed to me that there was a block of apartments in the car park. I did not feel 100% safe. The room was fine, a bit tired but it did the trick. One area the place really lets itself down is the check-in staff. They were not friendly and seemed bored by the whole thing. Would not stay again. Naples has better to offer."[25]

    j. In March of 2018, Police responded to a call at the Quality Inn in Camarillo, California, where A 51-year-old woman was found being held against her will and sex trafficked. Through a criminal investigation, authorities learned one of the hotel clerks was aware

---

[24] Review of Comfort Inn® & Executive Suites – Naples; *available at* https://www.tripadvisor.com/Hotel_Review-g34467-d85216-Reviews-or10-Comfort_Inn_Executive_Suites-Naples_Florida.html#REVIEWS

[25] Review of Quality Inn® & Suites Golf Resort; *available at* https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or20-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida.html#REVIEWS

of the trafficking and aided in its occurrence.[26]

k. In July of 2018, a reviewer described the Defendants' Quality Inn as follows: "This hotel is in the seedy part of Naples. It is by some apartments that are not desirable. The hotel pictures on internet are misleading. Rooms are extremely dated back to 1960's. TV was from the 1980's. Rooms smelt that they had been smoked in and hotel changed to were they are nonsmoking. Bathroom water pressure was very low and hot water was almost none. Pricing was high for what they offered. Did not feel safe. Will not be staying here again."[27]

l. In March 2021, a reviewer described the Defendants' Quality Inn as follows: "Nice motel, but bar was very shady...... me and my son ordered food from the Tiki Bar located by the swimming pool..... we went down to pick up our food and the bar was full of rowdy bikers that I believe we're friends of the bartenders.... my son was terrified as they start showing each other their guns and knives as they were

---

[26] One arrested in human trafficking attempt in Camarillo, VCSTAR.COM (Apr. 5, 2018), *available at* https://www.vcstar.com/story/news/local/communities/camarillo/2018/04/05/one-arrested-human-trafficking-attempt-camarillo/492228002/

[27] Review of Quality Inn® & Suites Golf Resort; *available at* https://www.tripadvisor.com/Hotel_Review-g34467-d85226-Reviews-or10-Quality_Inn_and_Suites_Golf_Resort-Naples_Florida.html#REVIEWS

consuming lots of whiskey..... I called the motel three times the next day to complain each time I was told the manager would call me back and she never did finally when I did get ahold of her after calling four times she pretty much said that I was a liar and none of that would have happened there for making me think she was Friends of the patrons also.... I asked her if she had looked at the videos and she had stated that she had not but she trusted her workers side of the story..... told her I was going to leave a bad review on here and she said who cares...... like I said very nice Motel a very very shady bar and the management does not care.....”[28]

80. Upon information and belief, Defendant Choice regularly reviews and monitors customer reviews of its properties posted on various online review websites such as yelp.com, Travelocity, and TripAdvisor, including the Quality Inn hotel where Plaintiff was trafficked.

81. Upon information and belief, Defendant Choice monitors customer reviews and complaints for all brand properties, including the Quality Inn hotel.

82. Upon information and belief, the branded properties like Quality Inn hotel depend on Defendant Choice for notification of negative customer reviews.

---

[28] Review of Comfort Inn® & Executive Suites – Naples; *available at* https://www.tripadvisor.com/Hotel_Review-g34467-d85216-Reviews-Comfort_Inn_Executive_Suites-Naples_Florida.html#REVIEWS

83. Upon information and belief, Defendant Choice, not the branded properties, house and control the data regarding customer reviews.

84. Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

85. Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[29]

86. Upon information and belief, Defendants Choice and the R&M Defendants had actual or constructive knowledge of law enforcement activity in close proximity to the Quality Inn hotel. For example:

 a. In November 2011, two East Naples men were charged with procuring minors for prostitution and lewd lascivious battery after young girls reported to police that they were being coerced into performing sexual acts with random men on several occasions.[30] A

---

[29] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (E.D. Tenn. May 29, 2007).
[30] *Deputies: 2 East Naples men solicit minors for prostitution*, Naples News Nov. 27, 2011, *available at* https://archive.naplesnews.com/news/crime/deputies-2-east-naples-men-solicit-minors-for-prostitution-ep-390595914-342737702.html/

third male was later identified and booked on the same charges.[31] These actions took place fifteen minutes from Defendants' Quality Inn hotel.

    b. In January 2013, federal agents made thirteen arrests in Naples in regards to a sex trafficking ring that exploited women from Naples to North Carolina.[32]

    c. In February 2018, a Lee County Judge resigned after being arrested for soliciting prostitution and resisting arrest during a police sting in Naples.[33]

87. Upon information and belief, Defendant Choice and the R&M Defendants had actual or constructive knowledge of law enforcement activity at the Quality Inn hotel reporting sexual battery, drug dealing and other illicit activities occurring at the hotel. For example:

    a. In November 2006, a woman living at the Defendants' Quality Inn hotel was charged with assaulting her boyfriend at the Quality Inn

---

[31] *Third arrest made in underage prostitution operation*, Naples Daily News, Dec. 1, 2011, *avaliable at* https://archive.naplesnews.com/news/crime/third-arrest-made-in-underage-prostitution-operation-ep-390562791-342732172.html/

[32] *Feds Make 13 Arrests in Naples, Florida-to-North Carolina Sex Trafficking Ring*, The Naples Daily News, Jan. 18, 2013, at pg. 4A.

[33] *Judge Accused of Soliciting Prostitution, Resisting Arrest Resigns*, Wink News, Feb. 13, 2018, *available at* https://winknews.com/2018/02/13/judge-accused-soliciting-prostitution-resisting-arrest-resigns/

hotel.[34]

b. In January 2013, a man living at the Defendants' Quality Inn hotel was arrested for cocaine possession.[35]

c. In May 2013, a man was arrested at the Defendants' Quality Inn hotel for grand theft.[36]

d. In January 2014, a man was arrested while sitting in the parking lot of the Defendants' Quality Inn hotel for drug possession.[37]

88. The above is just a mere sampling of information that Plaintiff was able to presently find in the public domain. Plaintiff contends there will be more information of this nature but will only be accessible during discovery.

**Defendant Choice and the R&M Defendants**
**Knew or Should Have Known that Their Hotel Business Venture**
**Facilitated the Sex Trafficking of Plaintiff A.D.**

89. In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2 would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would

---

[34] *Domestic Violence Arrests*, The Naples Daily, Nov. 29, 2006, at pg. 21.
[35] *Drug Arrests*, The Naples Daily, Jan. 07, 2013, at pg. 7.
[36] *Grand Theft Arrests*, The Naples Daily, May 7, 2013, at pg. 7.
[37] *Drug Arrests*, The Naples Daily, Jan. 26, 2014, at pg. 6.

consistently take advantage of A.D. and would soon traffick her in hotels throughout Central Florida.

90. After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

91. Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job at a hotel, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission.

92. Thereafter, Trafficker 2 coerced or otherwise forced A.D. into engaging in commercial sex acts by using threats of force, fraud, coercion, and a combination of these means.

    a. Trafficker 2 used threats of physical violence to force A.D. into engaging in commercial sex acts. Trafficker 2 would physically assault her if she did not adhere to his control and engage in commercial sex acts.

    b. Trafficker 2 would become violent if she told him she did not want to participate in his criminal activity.

    c. Trafficker 2 always carried a gun, which frightened A.D., and on

various occasions he pointed a loaded gun to her head or under her chin.

d. Trafficker 2 often choked A.D. to remind her that he was in control and to make her call him "daddy."

e. Trafficker 2 forced A.D. to take drugs as a means to control her and make her complacent to being sexually assaulted by dozens of men daily.

f. A.D. was always under the control of her trafficker. When A.D. was with a sex buyer, Trafficker 2 would wait outside in the parking lot overlooking the hotel room window or would hide in the closet of the hotel room. Even when A.D. slept, Trafficker 2 kept his arm draped around her stomach so if she moved he could feel it.

g. Trafficker 2 accompanied A.D. everywhere she went and always insisted on driving her where she needed to go.

93. While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property between approximately February 2012 and April 2012.

94. Plaintiff A.D. was first subjugated to trafficking at the Quality Inn hotel by Choice, in approximately February 2012 and April 2012.

95. Trafficker 2 advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

96. Trafficker 2 required A.D. to routinely request the biggest suite at the hotel.

97. For over a week, A.D. was confined to the suite and not allowed to leave. Trafficker 2 would bring food to the room. To keep her confined and unable to escape, Trafficker 2 would arrange buyers to come to the hotel room. There was a parade of unregistered male guests coming in and out of her hotel room at all times of the day. A.D. was sexually exploited and abused numerous times at the Quality Inn hotel. This procession of men would have been open and obvious to anyone working at the Quality Inn hotel.

98. A.D. was instructed to post Backpage advertisements using the hotel lobby computers, which were visible from the front desk. There was no separate office area in the lobby, so Trafficker 2 stood behind A.D. in an attempt to conceal their illicit advertisements and illicit photographs posted on Backpage.com.

99. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a. During a stay at the Quality Inn, a housekeeper saw a gun, $10,000 dollars in cash, cocaine, "molly", and marijuana in the room while

cleaning. Trafficker 2 gave the housekeeper $100 to keep the housekeeper quiet. The housekeeper did not report them.

b. Trafficker 2 would force A.D. to post advertisements for commercial sex on backpage.com from the hotel's computer in the business center, which was visible from the hotel lobby.

c. Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

d. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

e. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

f. A continuous procession of men entering and leaving A.D.'s room;

g. Excessive requests for sheets, cleaning supplies, towels, and room service;

h. The personal relationship between various hotel staff and A.D.'s trafficker; and

i. The direct employee encounters with A.D. and Trafficker 2 inside the Quality Inn hotel.

100. Defendants knew, or should have known, that A.D. was being

trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotel for his illegal sex trafficking activities.

101. Despite such constructive knowledge, Defendants knowingly or negligently provided lodging in which to harbor A.D. for sex trafficking.

102. Defendants had the opportunity to stop A.D.'s traffickers and offenders like them from victimizing A.D. and others like her. Instead, Defendants actively ignored common signs of sex trafficking and refused to take any reasonable measures to stop sex trafficking from occurring in their hotels.

103. Defendants refused to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

104. Choice, through its agency relationship with the R&M Defendants, would have constructive knowledge of A.D.'s trafficking at the Quality Inn hotel.

105. Evaluating the above facts and circumstances in totality, Defendant Choice and the R&M Defendants had actual or, at a minimum, constructive knowledge that the rental of rooms was for the purpose of sex trafficking A.D., in violation of the TVPRA.

## C. KNOWING BENEFIT:
### Defendant Choice and the R&M Defendants Knowingly Benefited From Their Hotel Business Venture

106. Upon information and belief, the R&M Defendants were apprised of instances of sex trafficking at its Quality Inn hotel via their corporate parent or franchisor, Defendant Choice. In addition, the R&M Defendants had personal knowledge of the trafficking of Plaintiff A.D. at the Quality Inn hotel. As outlined in further detail below, the R&M Defendants employees and staff openly observed signs of trafficking, did not aid Plaintiff, and thereby had constructive and/or actual knowledge of the trafficking of A.D. at the Quality Inn hotel. Despite these open and obvious signs, the R&M Defendants profited and received revenue, a percentage of which it then provided to Defendant Choice, directly from Plaintiff's trafficking via the rooms rented by her traffickers and rooms rented at the direction of her traffickers.

107. Through Choice's relationship with the staff at the Quality Inn hotel where A.D. was trafficked and where traffickers of Plaintiff were guests or visitors, Choice knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, membership fees and dues, reservation fees, and percentages of the gross room revenue which Choice is entitled to under corporate structure and relationship with its branded hotels under the

agreements.

108. Through its brand standards, franchise agreements, licensing agreements, and operating agreements, Defendant Choice controls the training, procedures, and policy for the Quality Inn hotel where A.D. was trafficked, which bears its brand name. Through its brand standards and franchise agreements, Choice knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known facilitated the sex trafficking of Plaintiff through the room rentals in which A.D. was trafficked.

109. Through the R&M Defendants and Choice's continuous business venture of renting hotel rooms, which were used for trafficking A.D. at the Quality Inn hotel, the R&M Defendants knowingly benefited or received something of value from activity that its facilitation of or participation in a venture which it knew or should have known had violated the TVPRA through the rental of rooms where A.D. was trafficked.

110. Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

111. Defendant Choice receives revenue from the money generated by the operations of the Quality Inn hotel, including revenue from the reservation fees charged for the room in which Plaintiff was trafficked at the Quality Inn hotel.

112. Defendant Choice benefits financially from room rentals, reservation fees, and other incidentals recognized by renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

113. Defendant Choice has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

114. The R&M Defendants directly benefited financially from room rentals, revenue from the rental fees charged for the rooms in which Plaintiff was trafficked at their hotel and other incidentals recognized by renting rooms.

115. Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

116. Defendants profited from the sex trafficking of A.D. and knowingly or negligently facilitated A.D.'s continuous victimization. The Defendants actively ignored A.D. and her trafficker repeatedly visiting the hotel, often with different guests, avoiding eye contact, and dressing inappropriately.

117. The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models

that attract and foster the commercial sex market for traffickers and buyers alike.

118. Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

119. Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

120. Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

121. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties despite assurances to the public, guests, and other stakeholders that they were taking these steps.

122. Defendants maintained their deficiencies and knowingly benefited by

maximizing profits by:

 a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

 b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

 c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotel;

 d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

 e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers

or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

**CAUSES OF ACTION**
**A.    COUNT ONE – 18 U.S.C. § 1595 ("TVPRA")**
**(Against all Defendants)**

123.   The Plaintiff A.D. incorporates each foregoing allegation.

124.   A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

125.   The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. § 1591(a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

126.   The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at

the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

127. A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. § 1591(a).

**PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a. All available compensatory damages for the described losses with respect to each cause of action;

    b. past and future medical expenses, as well as the costs associated with past and future life care;

    c. past and future emotional distress;

    d. consequential and/or special damages;

    e. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    f. disgorgement of profits obtained through unjust enrichment;

g.  restitution;

h.  punitive damages with respect to each cause of action;

i.  reasonable and recoverable attorneys' fees;

j.  costs of this action; and

k.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  May 9, 2023                    **RESPECTFULLY SUBMITTED,**

*/s/ Kathryn L. Avila*
**Kathryn L. Avila** (Fla. Bar No. 1019574)
**Emmie J. Paulos** (Fla. Bar No. 99010)
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com /

epaulos@levinlaw.com

*Attorneys for Plaintiff*